UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X

MUHAMMAD IQBAL,

                Petitioner,

– against –

CHRISTOPHER MILLER,

                Respondent.

**MEMORANDUM DECISION AND ORDER**

18-CV-01076 (AMD)

---------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The *pro se* petitioner, currently incarcerated at Great Meadow Correctional Facility, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petitioner was convicted after a jury trial of Murder in the Second Degree (N.Y. Penal Law § 125.25), Tampering with Physical Evidence (N.Y. Penal Law § 215.40), and Criminal Possession of a Weapon in the Fourth Degree (N.Y. Penal Law § 265.01). (ECF No. 1 at 2.) The petitioner claims that the trial court violated his Fifth, Sixth and Fourteenth Amendment rights when it denied his application to call an expert on the subject of false confessions. (*Id*. at 1-2.) For the reasons that follow, the petition is denied.

## FACTUAL BACKGROUND[1]

### I. Overview

In the afternoon of April 13, 2010, the petitioner strangled his wife, Khadija Mahel, after an argument.[2] The petitioner hid his wife's body under his bed and then dumped her body near a

---

[1] Because the petitioner was convicted, the facts are summarized in the light most favorable to the verdict. *See Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012).

[2] At various points in the record and briefings, Ms. Mahel's name is also spelled "Kadija Mahel."

1

Queens cemetery. A bystander found her the following day and called the police. Police arrested the petitioner a week later.

In written and oral statements to detectives on the night of his arrest, the petitioner admitted that he killed his wife. He also made a videotaped statement to an assistant district attorney. The petitioner was charged with Murder in the Second Degree (N.Y. Penal Law § 125.25), Tampering with Physical Evidence (N.Y. Penal Law § 215.40), and Criminal Possession of a Weapon in the Fourth Degree (N.Y. Penal Law § 265.01). (ECF No. 1 at 2.) The petitioner went to trial before the Honorable Gregory Lasak and a jury, and was convicted as described above. On February 11, 2014, Judge Lasak sentenced the petitioner to an aggregate indeterminate prison term of twenty-four years to life. (ECF No. 6-4 at 135-136.) The Appellate Division, Second Department affirmed the conviction, and the Court of Appeals denied leave to appeal. *See People v. Iqbal*, 147 A.D.3d 782, 782 (2d Dep't 2017) (affirming conviction); *People v. Iqbal*, 29 N.Y.3d 1092 (2017) (denying leave to appeal).

## II. Pretrial Motion to Introduce Expert Testimony

Prior to trial, the petitioner moved for and was granted a psychiatric evaluation as part of an effort to establish the affirmative defense of extreme emotional disturbance.[3] During the evaluation, the petitioner gave psychiatrist Dr. Brian Belfi the same account of the murder that he gave the detectives and the assistant district attorney on the night of his arrest. (ECF No. 6-2 at 130-133.)

---

[3] Under New York law, extreme emotional disturbance is an affirmative defense to second degree murder, *see* N.Y. Penal Law § 125.25(1)(a), which, if the defendant establishes it by a preponderance of the evidence, reduces a second degree murder conviction to manslaughter in the first degree. Defense counsel asked the trial court to submit this affirmative defense to the jury, but the court denied the application. (ECF No. 6-4 at 12-15.)

2

In February 2013, defense counsel applied to have another psychiatrist, Dr. Alexander Bardey, evaluate the petitioner in connection with an effort to establish that the petitioner's confessions were false. (ECF No. 6 at 81.) The court granted the application. (*Id.*) Dr. Bardey examined the petitioner and in a report summarizing his findings concluded that the petitioner did not have any mental or psychiatric illnesses; Dr. Bardey described some of the petitioner's characteristics and explained that someone with those qualities might be more susceptible to confessing falsely. (ECF No. 1-3 at 35-48.)

On October 22, 2013, the trial court heard argument on the petitioner's motion to introduce Dr. Bardey's testimony at trial. (ECF No. 6-1 at 143-152.) Defense counsel argued that the testimony should be permitted because certain factors—the petitioner's low level of intelligence, his limited education, his prior experiences in a country with a strong police state, and his unfamiliarity with the criminal justice system—made him more likely to confess falsely. (*Id.*) The prosecution responded that the proposed expert testimony was irrelevant, that the evidence demonstrated that the petitioner had confessed to the murder during his first psychiatric evaluation, and that the average juror could understand the concept of false confessions without the assistance of expert testimony. (*Id.*) The prosecution also pointed out that the petitioner owned his own businesses, learned English after moving to the United States, and applied to become a taxi driver—all of which undermined his claims that he was of below-average intelligence. (*Id.*) The court denied the petitioner's application. (*Id.* at 152:5-6.) Defense counsel did not object or claim that the court's ruling deprived the petitioner of any federal constitutional rights. (*Id.*)

## III. The Suppression Hearing

Prior to trial, the petitioner moved to suppress his statements to police and prosecutors. On September 13, 2012, Judge Lasak held a combined hearing on that motion.[4]

*a. The Prosecution's Case*

At the suppression hearing, the prosecution called two witnesses: Detective Leonard Schulman and Detective Justin Hughes.

Detective Schulman testified that he and two other detectives questioned the petitioner after the petitioner's arrest on April 22, 2010. (ECF No. 6-1 at 19.) The detectives advised him of his constitutional rights, which he waived. (*Id.* at 20-25.) Following the petitioner's waiver, the detectives asked the petitioner about his wife. (*Id.* at 25:6-14.) The petitioner initially claimed that Ms. Mahel had left their apartment, where they lived with their two young children, about a week earlier to look for a job. (*Id.* at 25:8-11.) When she did not return home, the petitioner assumed that she had gotten a job. (*Id.* at 25:10-14.) On April 14, 2010, he and the children were evicted from the apartment. (*Id.* at 25:13-14.)

The detectives then told the petitioner that they had found Ms. Mahel's body. The petitioner did not ask about how or where they had found the body, and said that he did not know anything about how she died. (*Id.* at 26.) He did ask for a drink. (*Id.*) At that point, the detectives took a break and resumed the interview at about 10:20 PM, when the petitioner again denied knowing anything about his wife's death. (*Id.* at 27:6-20.) Detective Schulman asked him whether he thought "anybody is going to believe that." (*Id.* at 27:16-17.) The petitioner shook his head and told detectives that he would tell them "the truth of what happened" because "[h]e didn't want his kids to think he planned this." (*Id.* at 27:17-20.)

---

[4] The petitioner also moved to suppress physical evidence.

4

In written and videotaped statements, the petitioner admitted that he strangled his wife after an argument. The petitioner said that he had lost his job as a livery driver several months before the killing. (*Id.* at 28:2-5.) On April 13, Ms. Mahel came home after a visit to the welfare office, and "challenged" the petitioner because he did not earn money or help with their children. (*Id.* at 28:6-15.) Berating, insulting and poking him, Ms. Mahel threatened that she would hit their children if he did not earn money to support the family. (*Id* at 28:8-16.)

The petitioner "got upset and couldn't take it," so he wrapped his arms around Ms. Mahel and dragged her to the floor. (*Id.* at 28:16-24.) He reached for an extension cord, wrapped it around her neck, and pulled it tight for about ten minutes until she went limp and "he knew she was dead." (*Id.* at 28-29.) The petitioner then dragged Ms. Mahel's body into the bedroom, hid it under the bed, and threw the extension cord into the building's garbage. (*Id.* at 29.)

When the petitioner returned home with his two children on April 14, 2010, the landlord had changed the locks and posted an eviction notice. (*Id.* at 29:13-15.) The petitioner entered the apartment through the fire escape and then let his children inside. (*Id.* at 29:16-20.) After borrowing a friend's car from a nearby livery stand, he rolled Ms. Mahel's body up in a carpet, carried her out of the building, and loaded her body into the backseat of the car. (*Id.* at 29, 33:21-25.) The petitioner drove around until he found a quiet street, dumped Ms. Mahel's body on the side of the road, and drove away. (*Id.* at 29:21-23.)

According to Detective Schulman, the petitioner was calm and conversational throughout the entire interview. (*Id.* at 27:23-24.) Detective Schulman asked if the petitioner wanted to write down his statement. The petitioner replied that he could not write, and agreed to have Detective Schulman type up the statement and read it back to him, which he did. (*Id.* at 30:4-10.) The petitioner also agreed to give a videotaped statement to Detective Ken Daly and

5

Assistant District Attorney ("ADA") Lauren Weinstock. (*Id.* at 30.) Detective Hughes described the petitioner's taped statement and the prosecution played the tape during the suppression hearing. (*Id.* at 246.s)

### b. The Defense's Case

The petitioner testified that he did not kill his wife and confessed only after the police threatened him. When police first approached him, he cooperated because he thought that they were investigating a traffic violation. (ECF No. 6-1 at 101:15-20.) Instead, the two detectives asked about his wife. When the petitioner said that he did not know what had happened to her, detectives pressured him to change his story. (*Id.* at 103-104.) He could not identify the detective, but claimed that one detective threw a chair at him, hit and kicked him, and threatened to put him on a terrorist watch list and send him to Guantanamo Bay, where he would never see his children again. (*Id.* at 103:18-25; 104:4-18; 105:16-19; 106:20-23; 107:18-23.) At one point, a second detective intervened and said, "Stop, you're going to kill him like other people." (*Id.* at 104:1-3.) The detectives instructed the petitioner to say that he and Ms. Mahel had a fight over money and that the petitioner grabbed a wire, wrapped it around his wife's neck, and killed her. (*Id.* at 107:1-5.) Although the detectives hit and kicked him, and threw a chair at him, the petitioner was not injured and did not seek medical attention. (*Id.* at 109:9-25; 118; 119:14-15; 120:13-18.)

The trial court denied defense counsel's motion to suppress the petitioner's statements.

## IV. The Trial

### a. The Prosecution's Case

The petitioner's trial began on October 18, 2013. The prosecution called fourteen witnesses: EMT Bethany Forrest, Detective William Brown, Detective Justin Hughes, Detective

6

Leonard Schulman, Detective Daniel Mulvanerty, ADA Lauren Weinstock, Mohamed Kebiri[5], Nicholas Petraco, Irene Wong, Stephanie Spruyt, Ibn Mohammad, Ileana Rivera, Dr. Sean Kelly, and Mohammed Rafi. The prosecution established the following facts.

On the morning of April 13, 2010, the petitioner's neighbor, Stephanie Spruyt, was leaving her apartment when she saw the petitioner sleeping on the floor outside of his apartment. (ECF No. 6-3 at 46:18-25.) Ms. Mahel, who was wearing a long blue nightshirt with birds on it, appeared "very upset." (*Id.* at 48:19-25; 50:10.) She apologized to Ms. Spruyt, threw a blanket at the petitioner, and motioned for him to come into the apartment. (*Id.* at 50:17-20.)

The next day, the petitioner asked Mohamed Kebiri, a former co-worker, if he could borrow Mr. Kebiri's car because his wife was flying in from Morocco. (ECF No. 6-2 at 322.) Mr. Kebiri pointed out that there were no flights from Morocco that late at night, and the petitioner said she was coming in from Europe. (*Id.* at 323.) The petitioner left with the car between 9:30 and 10 p.m., but returned about an hour later. (*Id.* at 326.) When Mr. Kebiri said that the petitioner could not have picked his wife up in that time, the petitioner claimed his wife told him she was staying in Europe. (*Id.* at 326-327.)

Later that night, a bystander called the police to report a body on Francis Lewis Boulevard in Queens. (ECF No. 6-2 at 173-174.) EMT Bethany Forrest went to the location and found a woman's body; the body had numerous injuries and abrasions, including bruising and ligature marks around her neck. (*Id.* at 177:4-6; 184-185.) There was no dirt or debris on the victim's hands and feet, suggesting the victim had been murdered elsewhere and left at the scene. (*Id.* at 198.) The woman was wearing a long blue nightshirt with birds. (*Id.* at 197-198.) Dr.

---

[5] In the record, Mr. Kebiri's name is also spelled as "Kabiri" and "Caber."

Sean Kelly performed an autopsy the next day and concluded that the victim had been strangled. (ECF No. 6-3 at 286:10-12.)

Meanwhile, the petitioner asked Mohammed Rafi, a friend who he had not seen for more than a year, to pick him and his children up because they had been evicted. (*Id.* at 190.) The petitioner claimed that his wife was in Morocco but did not want to talk about her any further. (*Id.* at 190:24-25.) The petitioner and the children stayed at Mr. Rafi's house until he asked the petitioner to leave on April 19, 2010. (*Id.* at 190:18.)

It was not until April 21, 2010 that the police identified the victim as Ms. Mahel. (ECF No. 6-2 at 228-229.) At that point, no one had reported that Ms. Mahel was missing. (*Id.* at 230:5-7.) Further investigation led investigators to the petitioner, her common law husband, who had an outstanding warrant for driving with a suspended license. (*Id.* at 230-232.) On April 22, 2010, Detective Hughes arrested the petitioner on the warrant, and brought him to the 105th Police Precinct, where he advised him of his constitutional rights. (ECF No. 6-3 at 108-112.) The petitioner, whose hands were bruised and scratched, confessed that he strangled Ms. Mahel, hid her body under his bed, and borrowed a friend's car to dump Ms. Mahel's body at the cemetery. (ECF No. 6-2 at 259; ECF No. 6-3 at 110-120.) He agreed to give the officers a DNA sample. (ECF No. 6-2 at 252, 255-256.) Detectives searched Mr. Kabiri's car and took hair samples, which matched Ms. Mahel's hair. (ECF No. 6-3 at 23.) Blood stains on Ms. Mahel's nightgown matched the petitioner's DNA. (*Id.* at 254:6-14.)

Ibn Muhammad was housed with the petitioner at Rikers Island. (*Id.* at 200.) The petitioner told Mr. Muhammad that he killed his wife after "a bad argument" over money. (*Id.* at 204.) At one point, Ms. Mahel "threatened to take their kids and leave." (*Id.* at 205-206.) The argument "got out of hand" and the petitioner strangled Ms. Mahel. (*Id.* at 205:2-3.) "[A] friend

8

of his from a cab service" helped the petitioner move the body, which the petitioner "threw [] out like trash" by a cemetery. (*Id.* at 206:1-11.)

## V. Verdict and Sentencing

The jury convicted the petitioner on all counts. (ECF No. 6-4 at 118-121.) At the February 11, 2014 sentencing, Judge Lasak described the evidence as "overwhelming," and that "there was nothing coercive at all" about the petitioner's confession, which was "clear, concise and obviously voluntary." (ECF No. 6-4 at 134:7-15.) He sentenced the petitioner to an aggregate indeterminate prison term of twenty-four years to life for the murder. (*Id.* at 135-136.)

## PROCEDURAL HISTORY

The petitioner, represented by counsel, appealed his conviction to the Appellate Division, Second Department, and raised three points on appeal. (ECF No. 1 at 2.) First, the petitioner argued that the trial judge violated his due process right to a fair trial and to present a defense by denying his application to call Dr. Bardey as an expert on false confessions. (ECF No. 6 at 25-38.) Second, the petitioner argued that the trial court should have granted his request to charge the jury on the affirmative defense of extreme emotional disturbance. (ECF No. 6 at 39-47.) Finally, the petitioner contended that his sentence was excessive. (ECF No. 6 at 47-50.)

On February 1, 2017, the Appellate Division affirmed the petitioner's conviction. *See Iqbal*, 147 A.D.3d at 782. The Appellate Division rejected the claims about the expert testimony as "unpreserved for appellate review," *Iqbal*, 147 A.D.3d at 782, and on the merits, ruling that the trial court's decision was an appropriate exercise of discretion, and that the proposed

testimony was not relevant under *People v. Bedessie*, 19 N.Y.3d 147, 149 (2012). *See Iqbal*, 147 A.D.3d at 782-83.[6]

On February 13, 2017, the petitioner applied for leave to appeal to the New York Court of Appeals, arguing primarily that the exclusion of the expert testimony was improper. (ECF No. 6 at 132-140.) The Court of Appeals denied leave to appeal on July 10, 2017. *See Iqbal*, 29 N.Y.3d at 1092.

On February 2, 2018, the petitioner filed this petition for a writ of habeas corpus. (ECF No. 1 at 1-5.)

## LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires a federal court reviewing a state prisoner's habeas petition to give deference to a state court's decision on the merits. *See* 28 U.S.C. § 2254(a). A federal court may not issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Johnson v. Williams*, 568 U.S. 289, 292 (2013); *Chrysler v. Guiney*, 806 F.3d 104, 116-17 (2d Cir. 2015).

For the purposes of federal habeas review, "clearly established law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision: (1) is

---

[6] The Appellate Division also found that the trial court's decision not to submit the defense of extreme emotional disturbance was appropriate because the evidence did not warrant it. *See Iqbal*, 147 A.D.3d at 782-83. Finally, the court rejected the petitioner's excessive sentence claim. *Id.*

10

contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412-13. The Court reviews the last reasoned state court decision. *See Wilson v. Sellers*, 138 S. Ct. 1188 (2018). The state court's factual determinations are presumed to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

A petitioner can seek federal habeas corpus relief only after he exhausts state court remedies and gives the state courts a full opportunity to review the merits of his claim. *See* 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In other words, a petitioner must first present "the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005) (citation omitted)).

## DISCUSSION

The petitioner raises one issue in his petition: that the trial court's denial of his application to introduce expert testimony regarding false confessions violated his Fifth, Sixth and Fourteenth Amendment rights. (ECF No. 1 at 1-2.) The petitioner argues that because the prosecution's evidence at trial consisted primarily of his confessions, he should have been permitted to introduce expert testimony on the subject of false confessions. (*Id.*)

a. *Procedural Bar*

Federal courts are precluded from "review[ing] questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Cone v. Bell*, 556 U.S. 449, 465

(2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). A state law ground is considered "independent" when a state court relied on the procedural bar as an "independent basis for its disposition of the case." *Parks v. Sheahan*, 104 F. Supp. 3d 271, 281 (E.D.N.Y. 2015) (internal citation omitted). A state law ground is "adequate" when it is "firmly established and regularly followed by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). When a state court's decision is based on independent and adequate state grounds, the claim is "necessarily beyond the reach of federal *habeas corpus* review" unless the petitioner can establish either cause and prejudice for the procedural default or that failure to consider the claim would result in a fundamental miscarriage of justice. *Brunson v. Tracy*, 378 F. Supp. 2d 100, 106 (E.D.N.Y. 2005) (citations omitted); *see also Davidson v. Cunningham*, No. 16-CV-01125 (JFB), 2017 WL 3738560, at *7 (E.D.N.Y. Aug. 29, 2017).

The Second Department rejected the petitioner's claim about the proposed expert testimony on procedural grounds and on the merits. First, the court held that the petitioner's claim was "unpreserved for appellate review." *Iqbal*, 147 A.D.3d at 782. The preservation rule, set forth in New York Criminal Procedure Law § 470.05(2), is "a New York state procedural law that the Second Circuit has explicitly recognized as both adequate and independent." *Parks*, 104 F. Supp. 3d at 282 (citing *Garvey v. Duncan*, 485 F.3d 709, 720 (2d Cir. 2007)). Accordingly, the petitioner's claim is procedurally barred unless he establishes cause or a fundamental miscarriage of justice. This is true even when the state court also rules on the merits. "If a state court has found that a claim is unpreserved for appellate review and then ruled 'in any event' on the merits, this determination constitutes an adequate and independent procedural bar." *Roberts v. Smith*, No. 10-CIV-4264 (BMC), 2010 WL 5288198, at *2 (E.D.N.Y. Dec. 14, 2010); *see*

*Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) ("[F]ederal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim.").

A petitioner whose claim is procedurally barred may still obtain federal habeas relief if he can establish cause for the procedural default and resulting prejudice, or that the denial of relief will result in a fundamental miscarriage of justice. *See Harris v. Reed*, 489 U.S. 255, 262 (1989); *Parks v. Sheahan*, 104 F. Supp. 3d 271, 282 (E.D.N.Y. 2015). Cause can be established by showing that "'some objective factor external to the defense impeded counsel's efforts' to raise the claim in state court." *Copeland v. Walker*, 258 F. Supp. 2d 105, 130 (E.D.N.Y. 2003) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). In order to show prejudice, the petitioner must demonstrate a "reasonable probability" that the outcome would have been different but for the alleged violation. *Edwards v. Superintendent, Southport C.F.*, 991 F. Supp. 2d 348, 367 (E.D.N.Y. 2013) (quoting *Strickler v. Grenne*, 527 U.S. 263, 289 (1999)). A fundamental miscarriage of justice occurs only in extraordinary cases, such as the conviction of a person who is actually innocent. *See Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (citations omitted); *Edwards*, 991 F. Supp. 2d at 367 (citations omitted).

The petitioner has not established either cause for the procedural default and ensuing prejudice, or that a denial of his petition would result in a fundamental miscarriage of justice.

b. *Merits*

The Appellate Division also found that the petitioner's "constitutional rights were not violated" and that the trial court "providently exercised its discretion in precluding the proposed

testimony because it was not relevant to the specific circumstances of this case." *Iqbal*, 147 A.D.3d at 782-83.

As a threshold matter, the admissibility of false confessions expert testimony is a question of state law—it does not present a constitutional question for which the petitioner is entitled to habeas relief. *See generally* 28 U.S.C. § 2254; *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("federal habeas corpus relief does not lie for errors of state law"). In *Bedessie*, 19 N.Y.3d at 156, the New York Court of Appeals held that the decision to admit or limit expert testimony on the issue of false testimony "lie[s] primarily in the sound discretion of the trial court[.]" The Second Department cited *Bedessie* in affirming the trial court's decision to preclude the proffered testimony, and "[i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

A federal habeas petitioner cannot prevail on a claim that a state court's evidentiary error deprived him of due process unless he shows "that the error was so pervasive as to have denied him a fundamentally fair trial." *Singletary v. Fischer*, 227 F.R.D. 209, 223 (E.D.N.Y. 2003) (citing *United States v. Agurs*, 427 U.S. 97, 108 (1976)). The standard is whether the erroneous evidentiary decision, "viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short, it must have been 'crucial, critical, highly significant.'" *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985) (quoting *Nettles v. Wainwright*, 677 F.2d 410, 414-15 (5th Cir.1982)).

First, there is no federal right to present expert testimony on the subject of false confessions. *See Mutterperl v. Griffin*, No. 13-CV-6028 (RJD), 2019 WL 3859400, at *9

14

(E.D.N.Y. Aug. 16, 2019) (denying application for writ of habeas corpus for trial court's exclusion of expert testimony on false confessions). Second, the trial court's exclusion of Dr. Bardey's testimony did not deprive the petitioner of a fair trial. The petitioner vigorously challenged the validity of his confessions as part of his defense at trial. Nor does Dr. Bardey's proposed testimony appear to have been "sufficiently material . . . to remove a reasonable doubt." *Collins*, 755 F.2d 16 at 19. Dr. Bardey did not conclude that the petitioner suffered from a psychiatric condition or mental illness, nor did he identify any evidence that the petitioner had been coerced into giving a false confession. Instead, Dr. Bardey summarized the various factors that might make someone like the petitioner more likely to confess to a crime he did not commit—factors a lay person is capable of understanding without the assistance of expert testimony.

Moreover, the other evidence presented by the prosecution corroborated the petitioner's confession. His blood was on the victim's nightgown and her hair was in the car the petitioner used to dump her body. The petitioner's cellmate described the petitioner's admission about how he killed his wife, which was consistent with his confessions. His friends also described the suspicious statements the petitioner made about his wife's whereabouts, statements that were inconsistent with his initial statements to detectives that his wife was out looking for a job. Accordingly, in light of the overwhelming evidence of the petitioner's guilt, there is no basis for disturbing the state court's rulings.[7]

---

[7] The fact that the petitioner admitted the killing to another psychiatrist, in an effort to establish the affirmative defense of extreme emotional disturbance, also undermines his claim that his confession was coerced. (ECF No. 6-2 at 130-133.)

15

## CONCLUSION

The petition for a writ of habeas corpus is denied in its entirety and the petition is dismissed. A certificate of appealability will not be issued. *See* 28 U.S.C. § 2253(c). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith.

**SO ORDERED.**

s/Ann M. Donnelly
Ann M. Donnelly
United States District Judge

Dated: Brooklyn, New York
      December 9, 2019